UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JEANNE ANDERSON,                                  Case No. 18-CV-2272 (PJS/HB)

                    Plaintiff,

v.                                                                     ORDER

RUGGED RACES LLC and DENNIS
RAEDEKE, INC., d/b/a Wild Mountain
Recreation Area,

                    Defendants.

---

L. Michael Hall, III, L. Michael Hall, and Mara Brust, HALL LAW, P.A., for
plaintiff.

Anthony J. Novak and Mark A. Solheim, LARSON KING LLP, for
defendants.

In September 2016, plaintiff Jeanne Anderson injured her foot while participating

in an "extreme" obstacle race known as Rugged Maniac Twin Cities ("the 2016 race").

The event was staged by defendant Rugged Races LLC ("Rugged Races") at Wild

Mountain Recreation Area, a property owned by defendant Dennis Raedeke, Inc.

("Wild Mountain").  Anderson brings various negligence claims against Rugged Races

and Wild Mountain.  This matter is before the Court on the motion of Rugged Races

and Wild Mountain for summary judgment.[1]  For the reasons that follow, defendants'

motion for summary judgment is granted.

I.  BACKGROUND

*A.  Rugged Maniac Obstacle Races*

Rugged Races has staged obstacle races around the United States since 2010.

Solheim Decl. Ex. 1, Scudder Dep. I 9:18–19, 10:23–25, ECF No. 50.  Each race attracts

thousands of participants, who are drawn by the extreme nature of the event.  *Id.*

at 36:1–9, 59:9–10, 80:11–16.  Each race requires participants to complete a series of

obstacles that have been constructed out of such elements as barbed wire, open flames,

and muddy water.  *Id.*  Injuries are extremely common; several hundred participants

might suffer injuries at a single race.  Solheim Decl. Ex. 3, Scudder Dep. II 31:3–13, ECF

No. 50.

Rugged Races follows a series of protocols—before, during, and after the

race—to ensure that the course is safe.  Obstacles are inspected on several occasions

---

[1]Only Rugged Races filed a formal motion for summary judgment.  Def.'s Mot. Summ. J., ECF No. 47.  But in their briefs and at oral argument, the attorneys for Rugged Races—who are also representing Wild Mountain—made clear that they were also moving for summary judgment on behalf of Wild Mountain.  *See* Def.'s Mem. Supp. Summ. J. 13–14, ECF No. 49 (arguing for dismissal of claims against Wild Mountain); Def.'s Proposed Order, ECF No. 51; Mot. Hr'g Tr. 25–26, ECF No. 75 (discussing claims against Wild Mountain).  Anderson has not objected to the Court treating the summary-judgment motion as having been filed on behalf of both defendants.  *See* Pl.'s Mem. Opp'n Summ. J. 45, ECF No. 61 (discussing claims against Wild Mountain).

before the race begins, including during the construction process, on the day before the race, and on the morning of the race.  Scudder Dep. I 37:15–18, 44:7–13, 112:3–11; Solheim Decl. Ex. 5, Melnik Dep. 35:12–23, ECF No. 50.  The project manager will not allow the event to begin until he is satisfied that the course is safe.  Scudder Dep. I 112:3–11.

During the race, Rugged Races staff circulate throughout the course to ensure that the obstacles are functioning properly.  *Id.* at 113:20–114:3.  In addition, Rugged Races contracts with Staff Medics, LLC ("Staff Medics") to provide medics, who treat injured participants and maintain records of each injury.  *Id.* at 34:3–20; Scudder Dep. II 33:19–24, 80:1–7.  After each injury, the medics treat the injured participant, and the project manager or another staff member inspects the obstacle on which the participant was injured.  Scudder Dep. I 158:4–16; Scudder Dep. II 36:19–37:5.  If the injury was caused by a defect in the obstacle, the project manager has discretion to fix the defect or close the obstacle for the remainder of the race.  Scudder Dep. II 41:1–5, 71:4–12, 73:7–13.

After the race, the project manager notes any "trends" in injuries in the post-race recap report, and the entire Rugged Races staff discusses the report to try to improve the safety of future races.  Scudder Dep. I 165:20–166:4; Scudder Dep. II 38:5–13, 84:5–15.

*B.  2016 Rugged Maniac Twin Cities and Bang the Gong*

Rugged Races has hosted the Rugged Maniac Twin Cities obstacle race at Wild Mountain since 2010.  Scudder Dep. I 23:24–24:5.  The 2016 race course included 26 obstacles, including the "Bang the Gong" obstacle that is the subject of this litigation. Solheim Decl. Ex. 2, Twin Cities Sept. 2016 Course Map, ECF No. 50.  Bang the Gong was comprised of a platform raised a few inches above the ground, a pit filled with water, and a trussing with several gongs hanging over the top of the pit.  Scudder Dep. I 121:6–13; Melnik Dep. 24:1–26:9.  To complete the obstacle, participants had to jump off the platform, strike the gong while in midair, land in the pit of water, climb out of the pit, and continue to the next obstacle.  Melnik Dep. 26:21–24.

Bang the Gong was introduced to Rugged Maniac courses sometime in 2015 or 2016, and Rugged Races' construction crew had set up the obstacle multiple times prior to the 2016 race.  Scudder Dep. I 117:5–118:14, 120:8–10.  The construction crew set up Bang the Gong at the 2016 race following the same process that it had used at other races.[2]  Melnik Dep. 27:15–18.  That process involved marking and digging the landing pit, removing debris from the pit, laying down tarp, performing two walkthroughs of the tarp-covered pit, filling the pit with water, and building the platform and trussing.

---

[2]None of the members of the construction crew had a specific memory of setting up Bang the Gong at Wild Mountain in 2016, but none was aware of any time when Rugged Races had deviated from the construction protocols for that obstacle.  Melnik Dep. 10:5–10, 87:9–14.

*Id.* at 10:15–17, 14:9–13, 16:22–24, 17:16–24, 24:15–16, 26:5–9, 30:2–12.  Hence, the pit was inspected a total of three times before it was filled with water.  Bang the Gong was inspected two more times after the pit was filled with water—first a day or so before the race and then again on the morning of the race.  *Id.* at 35:17–23, 37:13–20.  Rugged Races does not document these inspections; instead, Rugged Races notes any problems with the obstacles in the post-race recap report.  Scudder Dep. I 113:11–15, 114:8–12, 133:22–134:11, 137:15–17.  The report regarding the 2016 race did not identify any problems with Bang the Gong.  *Id.*

### C.  *Jeanne Anderson and the Injuries on Bang the Gong*

On June 22, 2016, Anderson and two of her coworkers registered for Rugged Maniac Twin Cities.  Solheim Decl. Ex. 2, Order Confirmation Email, ECF No. 50; Solheim Decl. Ex. 8, Anderson Dep. 86:2–9, ECF No. 50.  As part of the registration process, Anderson executed a Race Participant Agreement, which included an exculpatory clause.  Scudder Dep. I 50:4–13.  That clause released Rugged Races and Wild Mountain "from any and all claims resulting from the INHERENT RISKS of the Event or the ORDINARY NEGLIGENCE of Rugged Races LLC (or other Released Parties) . . . ."  Brust Decl. Ex. M, Race Participant Agreement, ECF No. 62.

On September 10, 2016, the day of the race, Anderson arrived at Wild Mountain with her two coworkers.  Anderson Dep. 110:13–22.  When checking in, Anderson once

again signed the Race Participant Agreement (which again included the exculpatory clause quoted above). *Id.* at 113:9–19; Solheim Decl. Ex. 2, Signature Sheet, ECF No. 50. Some time thereafter, Anderson and her coworkers began the obstacle course. Anderson Dep. 117:6–21. Anderson successfully completed seven obstacles before approaching Bang the Gong. *Id.* at 118:4–22; Solheim Decl. Ex. 2, Twin Cities Sept. 2016 Course Map.

Anderson paused and briefly watched a few other people complete the obstacle. Anderson Dep. 124:19–22. She then ran up the platform, jumped, reached for the gong, and landed on her feet in the pit of water. *Id.* at 140:12–16. Upon landing, Anderson's "left foot hit something hard"—something that felt like a rock.[3] *Id.* at 140:21–25. Anderson immediately felt severe pain in her left heel. Unable to stand, she dropped to her knees and crawled out of the pit. *Id.* at 145:3–10.

Anderson was transported to the medical tent for an examination. *Id.* at 147:2–23. At about 1:15 pm, Anderson reported to the medic that she had landed on a rock. Brust Decl. Ex. G, Staff Medics LLC Patient Care Rep. for Jeanne Anderson, ECF No. 62. After Anderson's examination at the medical tent, one of Anderson's coworkers drove her to the hospital for further treatment. Anderson Dep. 156:17–157:11.

---

[3]Anderson could not see the hard object because the water was muddy, but she could feel a difference between the hard surface on which her left foot landed and the soft surface on which her right foot landed. Anderson Dep. at 141–142.

Anderson later learned that the calcaneus bone of her left heel had "exploded"; she suffers from pain and limited mobility to this day. *Id.* at 158:10–14, 160–66.

Anderson was one of five participants to suffer a foot injury while completing the Bang the Gong obstacle on September 10, 2016:

(1) Angela Craig fractured her calcaneus bone when her left foot impacted on something hard in the landing pit. Brust Decl. Ex. C, Craig Decl. ¶ 5, ECF No. 62. Her injury report, submitted at 10:50 am, states that she "landed wrong on [her] foot when [she] hit bottom of water." Solheim Decl. Ex. 2, Staff Medics LLC Patient Care Rep., ECF No. 50.

(2) Alexandra Harding broke her ankle sometime before 12:15 pm when her "right foot impacted a hard object that felt like a rock hidden below the surface of the water." Brust Decl. Ex. D, Harding Decl. ¶ 5, ECF No. 62. Her injury report provides the following incident description: "jumped into pit—uneven terrain, felt pain . . . ." Solheim Decl. Ex. 2, Staff Medics LLC Patient Care Rep.

(3) At roughly 1:00 pm, Amelia Erickson broke the calcaneus bone in her right foot when she landed on a rock in the landing pit. Brust Decl. Ex. E, Erickson Decl. ¶¶ 5, 10, ECF No. 62. Erickson reported both her injury and the presence of a rock in the landing pit to a medic at 1:10 pm. *See* Solheim Decl. Ex. 2, Staff Medics LLC Patient Care Rep. (stating that the injury occurred after she "came down flat on a rock").

(4) Also at roughly 1:00 pm,[4] Anderson was injured.  As noted, she reported her injury to a medic at about 1:15 pm.  The medic wrote that Anderson "landed on a rock on bottom of obstacle."  Brust Decl. Ex. G.

(5) Finally, also at roughly 1:00 pm, Siri Taylor injured her left foot after landing on a rock in the landing pit.  She told a Rugged Races staffer about the rock and then reported her injury to a medic around 1:31 pm.[5]  Brust Decl. Ex. F, Taylor Decl. ¶¶ 5–8, ECF No. 62.

Despite multiple injuries occurring on the obstacle—and despite receiving multiple reports of the presence of a rock or similar hazard in the water—Rugged Races kept Bang the Gong open throughout the race.  Scudder Dep. II 44:1–4.  Notably, over 4,000 other participants completed the obstacle without incident.  Solheim Decl. Ex. 2, Rugged Maniac Twin Cities Event Recap Rep., ECF No. 50.

---

[4]This is the Court's estimate, based on the fact that Anderson did not report her injury until 1:15 pm, after she had hurt her foot, crawled out of the pit, reported her need for medical attention, waited for a medic to arrive, and been transported to the medical tent.

[5]At the hearing, Anderson's counsel suggested that Taylor may have been injured before Anderson.  Mot. Hr'g Tr. 39:8–17.  The Court found no evidence in the record to support this contention.

## II. ANALYSIS

### A. *Standard of Review*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

### B. *Negligence*

### 1. Exculpatory Clause

The common law of Minnesota recognizes only one civil claim for negligence. *See Peet v. Roth Hotel Co.*, 253 N.W. 546, 548 (Minn. 1934) ("The doctrine that there are three degrees of negligence—slight, ordinary, and gross—does not prevail in this state." (internal quotation marks and citation omitted)). In other words, the common law of Minnesota does not recognize a separate cause of action for gross negligence or for any other type of negligence that exceeds ordinary negligence. *Doub v. Life Time Fitness, Inc.*, A17-0322, 2017 WL 4341814, at *4 (Minn. Ct. App. Oct. 2, 2017) ("But a claim for gross

negligence is not recognized as a distinct cause of action, separate from a cause of action for ordinary negligence."). Sometimes, however, the text of a statute or contract will differentiate among degrees of negligence—for example, between ordinary negligence and gross negligence. When a statute or contract does so, then a court must also do so when enforcing that statute or contract. *See id.* at *5; *Beehner v. Cragun Corp.*, 636 N.W.2d 821 (Minn. Ct. App. 2001).

This is such a case. It is undisputed that Anderson signed the Race Participant Agreement, that the agreement is enforceable, and that the agreement included a valid exculpatory clause that bars Anderson from bringing claims against defendants arising out of "ordinary negligence" or the "inherent risks" of the event. Brust Decl. Ex. M; s*ee Schlobohm v. Spa Petite, Inc.*, 326 N.W.2d 920, 923 (Minn. 1982) (noting that exculpatory clauses are enforceable but are "strictly construed against the benefited party"). The exculpatory clause that binds Anderson is comparable to the exculpatory clause that was enforced by the Minnesota Court of Appeals in *Beehner*, 636 N.W.2d at 825–26. Here, as in *Beehner*, the plaintiff can recover only if she can prove that a defendant acted with greater-than-ordinary negligence. *Id.* at 829–830.

Rugged Races argues that the exculpatory clause contained in the Race Participant Agreement bars any claim based on *any* degree of negligence, citing *Doub*, 2017 WL 4341814, at *4. Def.'s Reply Mem. Supp. Summ. J. 8–9, ECF No. 68. But the

exculpatory clause in *Doub* barred "any" negligence claims.  2017 WL 4341814, at *1, 4

(recognizing the differences between the exculpatory clauses in *Beehner* and *Doub*).

Because the exculpatory clause in *Doub* barred any claim that sounded in negligence,

the Minnesota Court of Appeals concluded that the plaintiff could not bring any type of

negligence claim, no matter the degree of negligence alleged.  *Id.* at *3–5.  But the

exculpatory clause in the Race Participant Agreement, unlike the exculpatory clause in

*Doub*, does not bar any type of negligence claim.  Instead, like the exculpatory clause in

*Beehner*, it bars only a claim of ordinary negligence.

To defeat defendants' summary-judgment motion, then, Anderson must point to

evidence in the record that would allow a reasonable jury to find that Rugged Races

acted with greater-than-ordinary negligence.  *See Beehner*, 636 N.W.2d at 829 ("In a

dispute over the applicability of an exculpatory clause, summary judgment is

appropriate only when it is uncontested that the party benefited by the exculpatory

clause has committed no greater-than-ordinary negligence.").  In Minnesota,

"[n]egligence is generally defined as the failure 'to exercise such care as persons of

ordinary prudence usually exercise under such circumstances.'" *Domagala v. Rolland*,

805 N.W.2d 14, 22 (Minn. 2011) (quoting *Flom v. Flom*, 291 N.W.2d 914, 916 (Minn.

1980)).  Thus, Anderson must prove that the conduct of Rugged Races was more

culpable than simply failing to exercise the level of care that would have been exercised under the circumstances by a reasonable operator of extreme obstacle races.

At the same time, Anderson is not required to prove that Rugged Races acted with gross negligence.  If ordinary negligence is at one end of the actionable negligence spectrum, gross negligence is at the other end:

> Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence.  It is materially more want of care than constitutes simple inadvertence.  It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care.  It is very great negligence, or the absence of slight diligence, or the want of even scant care.

*State v. Bolsinger*, 21 N.W.2d 480, 485 (Minn. 1946).  Clearly, there is room on the spectrum between negligence that is "ordinary" and negligence that is "gross." For example, negligence that is great (but not "very great") or somewhat higher (but not "substantially higher") than ordinary negligence would qualify as greater-than-ordinary negligence, even though it would not reach the level of gross negligence.[6]

---

[6]Rugged Races argues that Anderson must prove gross negligence because she *pleaded* only gross negligence in her complaint.  Def.'s Reply Mem. Supp. Summ. J. 12–13.  But it is impossible to act with gross negligence without acting with greater-than-ordinary negligence, and it is impossible to act with greater-than-ordinary negligence without acting with ordinary negligence.  Thus a plaintiff who pleads a claim for gross negligence provides fair notice to the defendant that the plaintiff is claiming that the defendant acted with all degrees of negligence from ordinary to gross. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) ("[T]he complaint must say enough to give the defendant fair notice of what the plaintiff's claim is and the

(continued...)

Anderson alleges that Rugged Races acted with greater-than-ordinary negligence in three ways:  (1) by failing to respond to reports of a rock in the landing pit of Bang the Gong; (2) by failing to follow routine practices in constructing and administering the 2016 race; and (3) by failing to remedy the low water level in the landing pit of Bang the Gong.  The Court considers each contention in turn.

### 2.  Notice of and Response to the Rock

Anderson first alleges that Rugged Races was negligent—and that its negligence exceeded ordinary negligence—in failing to respond to reports of a rock in the landing pit of Bang the Gong.[7]  Anderson argues that Rugged Races was placed on notice of a hazard in Bang the Gong's landing pit and that Rugged Races acted with greater-than-ordinary negligence when it failed to remove the hazard, warn participants, or shut down the obstacle.  Pl.'s Mem. Opp'n Summ. J. 7, ECF No. 61.  The Court disagrees.

---

[6](...continued)
grounds upon which it rests." (internal quotation marks and citation omitted)); *Adams v. Am. Fam. Mut. Ins.*, 813 F.3d 1151, 1154 (8th Cir. 2016) ("A theory of liability that is not alleged or even suggested in the complaint would not put a defendant on fair notice and should be dismissed.").

[7]Rugged Races disputes that there was a rock in the landing pit of Bang the Gong.  Def.'s Reply Mem. Supp. Summ. J. 4–5, 11.  On a motion for summary judgment, however, the Court must resolve all conflicts and draw all inferences in favor of the nonmoving party.  *Anderson*, 477 U.S. at 255.  Anderson testified in her deposition that she felt a rock, and the declarations of the other injured participants all describe feeling a rock or similar object.  Anderson Dep. 141:3–7; Craig Decl. ¶ 5; Harding Decl. ¶ 5; Erickson Decl. ¶ 5; Taylor Decl. ¶ 5.  The Court therefore must assume that a rock was present in the landing pit of Bang the Gong.

Any claim for negligence rests on "the actor's knowledge, actual or imputed, of the facts out of which the alleged duty arises." *Rue v. Wendland*, 33 N.W.2d 593, 595 (Minn. 1948). A defendant "will not be held to knowledge of risks which are not apparent to him." *Id.* at 596 (internal quotation marks and citation omitted); *see also Johnson v. City of Minneapolis*, No. Civ. 01-892(RHK/SRN), 2002 WL 31815086, at *2 (D. Minn. Dec. 13, 2002). Despite Anderson's contentions to the contrary, the evidence in the record is clear that Rugged Races did not have notice of the rock in the landing pit of Bang the Gong until—at most—just minutes before Anderson's injury.

As described above, five participants were injured on the Bang the Gong obstacle during the 2016 race: Craig, Harding, Erickson, Anderson, and Taylor. The first three injuries were reported to Staff Medics at 10:50 am, 12:15 pm, and 1:10 pm. Craig Decl. ¶ 6; Harding Decl. ¶ 7; Erickson Decl. ¶ 7. Anderson's injury was reported to Staff Medics at 1:15 pm. Brust Decl. Ex. G. And Taylor's injury was reported to Staff Medics at 1:31 pm. Taylor Decl. ¶ 8.

Anderson testified that she was driven to the medical tent with two other participants who were injured on Bang the Gong—almost certainly, Erickson and Taylor. Anderson Dep. 147:17–25. After arriving at the medical tent, Erickson reported her injury at 1:10 pm, and Anderson reported her injury at 1:15 pm. Clearly, then, Erickson did not report her injury until *after* Anderson was injured. And even if

Erickson was not one of the two participants who were transported to the medical tent with Anderson—and even if Anderson jumped into the pit at 1:11 pm or 1:12 pm and then was instantly rushed to the medical tent in time to report her injury at 1:15 pm—there would not have been sufficient time between Erickson's report at 1:10 pm and Anderson's injury at 1:11 pm or 1:12 pm for Rugged Races to have taken preventative measures. In sum, then, Rugged Races had notice of only two injuries on Bang the Gong—Craig's injury and Harding's injury—prior to Anderson jumping into the pit.

Turning to those two injuries:

*a. Craig's Injury*

As noted, Craig reported her injury at 10:50 am, long before Anderson was injured. But it does not appear that Craig informed Rugged Races, Staff Medics, or anyone else that the *reason* she had been injured was because of a rock in the landing pit of Bang the Gong. *See* Craig Decl. Her injury report does not mention a rock; instead, it simply says that Craig "landed wrong on [her] foot when [she] hit bottom of water." Solheim Decl. Ex. 2, Staff Medics LLC Patient Care Rep. Landing wrong after a jump is an inherent risk of an obstacle race. Scudder Dep. I 152:18–22. The fact that Rugged Races learned that Craig hurt her foot when landing wrong in the pit of Bang the Gong did not put Rugged Races on notice that there was a rock in that pit.

-15-

Craig *now* says that she "impacted something very hard" when she jumped into the landing pit of Bang the Gong.  Craig Decl. ¶ 5.  But she does not say that *on the day of the race* she told Rugged Races or Staff Medics that there was a rock or other "very hard" object in the landing pit.  Accordingly, the Court finds that Craig's injury did not put Rugged Races on notice of the rock that later harmed Anderson.

### b.  Harding's Injury

Harding reported her injury at 12:15 pm, less than an hour before Anderson was injured.  Like Craig, Harding *now* says that she "impacted a hard object."  Harding Decl. ¶ 5.  Again, though, Harding does not say that *on the day of the race* she informed Rugged Races or Staff Medics that there was a rock or other "hard object" in Bang the Gong's landing pit.  *See* Harding Decl.

Harding's injury report notes that her injury occurred when she "jumped into pit—[landed on] uneven terrain, felt pain . . . ."  Solheim Decl. Ex. 2, Staff Medics LLC Patient Care Rep.  A jury could therefore find that, approximately an hour before Anderson was injured, Rugged Races had notice that the bottom of Bang the Gong's landing pit was "uneven."  But Anderson cannot recover against Rugged Races for failing to respond to this report.

First, Anderson does not claim that she was injured by "uneven terrain," and her own expert testified that her injury was not caused by landing on terrain that was

uneven.  Ziejewski Decl. Ex. A, at Anderson00726, ECF No. 65.  Rather, Anderson and

her expert testified that she was injured by landing on a rock or similarly rigid object in

the landing pit.

Second, the Race Participant Agreement's exculpatory clause bars Anderson

from recovering for injuries that arise out of the "inherent risks" of the race.  Brust Decl.

Ex. M.  The Agreement defines "inherent risks" as "risks that cannot be eliminated

completely (without changing the challenging nature of the Event) . . . ."  *Id*.  The

Agreement identifies "encounters with obstacles (e.g., natural and man-made water,

road and surface hazards . . . )" as examples of inherent risks.  *Id*.

If Anderson was indeed injured by landing on an uneven surface—instead of by

landing on a rock—then her injury was attributable to an "inherent risk" of the race.

Anderson was participating in an extremely challenging obstacle race on an outdoor

course that had been carved out of the side of a mountain.  Uneven terrain was part of

the challenge that drew individuals to participate in the race.  In the language of the

release, uneven terrain was a "surface hazard" that could not be "eliminated completely

[]without changing the challenging nature of the Event . . . ."  *Id.*

Anderson's own expert, Todd Seidler, supports this conclusion.  His report says

that "[m]any injuries occur in obstacle course runs that are caused by risks that are

inherent, and thus reasonably anticipated in the activity."  Seidler Decl. Ex. A,

at Anderson00799, ECF 64.  Seidler cites as examples "slipping in a muddy area, *tripping on uneven ground*[,] or possibly colliding with another participant."  *Id.* (emphasis added).  Again, "uneven ground" comes with the territory for those who choose to participate in outdoor obstacle races.[8]

Finally, nothing in the record supports the notion that any unevenness in the ground under Bang the Gong's landing pit resulted from greater-than-ordinary negligence on the part of Rugged Races.  *See Beehner*, 636 N.W.2d at 830 (applying exculpatory clause to bar claim based on a loose saddle because the defendant did not increase the risk of the saddle slipping via greater-than-ordinary negligence).  To the contrary, the record indicates that Rugged Races inspected the pit multiple times to ensure that it was reasonably flat.  Melnik Dep. 14:9–13, 17:16–24, 30:2–12.  Moreover, prior to Anderson's injury, hundreds (if not thousands) of participants had jumped off the same platform into the same pit, and not one of them (save Harding) had complained of uneven terrain.

In sum, the record simply does not support Anderson's contention that Rugged Races knew of a rock in the landing pit of Bang the Gong far enough in advance of her

---

[8]Rugged Races argues that the presence of a rock in the landing pit of Bang the Gong would also have been an inherent risk of the obstacle.  *See* Def.'s Mem. Supp. Summ. J. 14–15.  But given the conflicting evidence on that issue, a reasonable jury could find that a rock in the landing pit was not an inherent risk.  *Compare* Scudder Dep. I 75:22–76:15, *with* Anderson 127:9–17, *and* Seidler Decl. Ex. A, at Anderson00799–800.

injury to have taken preventative action.  Accordingly, the Court finds that Anderson was not injured because Rugged Races exhibited greater-than-ordinary negligence in failing to respond to a report of a rock in the landing pit of Bang the Gong.

### 3.  Failure to Follow Routine Practices

Anderson next argues that, even if Rugged Races did not know that there was a rock in the landing pit of Bang the Gong, Rugged Races nevertheless exhibited greater-than-ordinary negligence in failing to inspect the obstacle before the race.  Had Rugged Races adequately inspected the obstacle, Anderson argues, Rugged Races would have discovered and removed the rock that later caused her injury.

Anderson makes much of the unremarkable fact that none of the Rugged Races staff members has a specific memory of inspecting one of many obstacles (Bang the Gong) at one of many races (Rugged Maniac Twin Cities) held in one of many years (2016) that Rugged Races has been staging obstacle races.  Anderson goes so far as to claim that there is no evidence that Rugged Races inspected Bang the Gong in connection with the 2016 race.  Pl.'s Mem. Opp'n Summ. J. 7–8.

Putting aside the fact that the burden is on Anderson to prove that Rugged Races did *not* adequately inspect the obstacle—not on Rugged Races to prove that it *did* adequately inspect the obstacle—Anderson is incorrect about the evidence.  Under Fed. R. Evid. 406, "[e]vidence of . . . an organization's routine practice may be admitted to

prove that on a particular occasion the . . . organization acted in accordance with the habit or routine practice."  The testimony of senior vice president Bradford Scudder and construction crew member Christian Melnik establishes that, at the time of the 2016 race, Rugged Races had a routine practice of inspecting each obstacle before each race, during each race, and after each race.  It does not matter that Scudder's and Melnik's testimony about Rugged Races' routine practice is not corroborated by any contemporaneous business record or eyewitness testimony, as evidence of the routine practice of an organization is admissible under Rule 406 "regardless of whether it is corroborated or whether there was an eyewitness."  Fed. R. Evid. 406.

Anderson next argues that, even if Rugged Races generally followed a set of routine practices when it sponsored a race, there is evidence that Rugged Races deviated from its routine practices in three respects in connection with the 2016 race. And, according to Anderson, the fact that Rugged Races did not follow three of its routine practices in connection with the 2016 race would allow the jury to infer that it did not follow *other* of its routine practices, such as its routine practice of inspecting Bang the Gong multiple times before filling the landing pit with water.

The three deviations identified by Anderson are the following:

*a. Failure to Follow Post-Injury Protocols During the 2016 Race*

Rugged Races testified that, during a race, the project manager will receive notice

that a possible defect in an obstacle has caused an injury from two sources:  (1) calls for

assistance with injuries that he hears on the radio that he carries during the race and

(2) the medical director, who tracks reports from the medics about problems with

obstacles described by injured participants and passes that information on to the project

manager.  Scudder Dep. I 169:9–12; Scudder Dep. II 35:20–36:4, 44:13–20.  According to

Rugged Races, when the project manager learns that a participant has been injured on

an obstacle, the project manager will promptly inspect that obstacle.  *See, e.g.*, Scudder

Dep II 12:6-7, 13:20-24.  Usually, these inspections are cursory and do not require any

modifications to the obstacle, because the injury was not caused by a problem with the

obstacle.  *Id.* at 36:19–25.  If, however, the project manager learns that the injury was

caused by a problem with the obstacle, he may temporarily shut down the obstacle until

the problem is resolved.  *Id.* at 71:1–21.  If the problem cannot be resolved, he may shut

down the obstacle for the rest of the race.  *Id.*

Based on the evidence in the record, a jury could find that Rugged Races did not

follow this practice during the 2016 race.  As discussed, Erickson, Anderson, and Taylor

all reported that they had been injured by a rock in the landing pit of Bang the Gong.

The project manager should have learned of their reports, and, after learning of their

reports, he should have gone into the landing pit and searched for the rock.  Scudder

Dep. II 42:15–19; Melnik Dep. 44:4–6.  It is clear, however, that the project manager did

not inspect the landing pit.  Such an inspection would have required the project

manager to temporarily close Bang the Gong, Melnik Dep. 44:9–11, and Bang the Gong

was not closed at any point during the race, Scudder Dep. II 44:1–4.

In short, the evidence supports Anderson's contention that, during the 2016 race,

Rugged Races failed to follow its routine practice of inspecting an obstacle after learning

that a participant had been injured on that obstacle.

### b. Failure to Follow Procedures in Creating Post-Race Recap Reports

Scudder testified that, after each race, the project manager would compose a

report, and that report would mention any "trends" in injuries.  Scudder Dep. II 38:5-13.

Anderson cites this as another routine practice that was not followed during the 2016

race, as at least five participants were injured on Bang the Gong, and yet the post-race

report does not mention any of those injuries.  *See* Solheim Decl. Ex. 2, Rugged Maniac

Twin Cities Event Recap Rep.  Further, Anderson points to evidence that multiple

injuries occurred on the Bang the Gong obstacle during other races staged by Rugged

Races, *see* Pl.'s Mem. Opp'n Summ. J. 11–14, and those injuries were also not mentioned

in the reports of those races, Scudder Dep. II 82:2–5.

-22-

Unlike Rugged Races' practice of inspecting obstacles following injury reports, Rugged Races' practice of noting injury trends in post-race reports cannot fairly be characterized as a "routine practice" for purposes of Rule 406.  A routine practice is established when an organization uniformly—almost reflexively—responds in a specific way to a specific circumstance.  *See United States v. Jones*, No. 14-cr-148 (SRN/LIB), 2015 WL 1020811, at *1 (D. Minn. Mar. 9, 2015) (noting habit evidence is inadmissible if conduct is "'not sufficiently regular or uniform'" and noting the Eighth Circuit treats "'habit' and 'routine practice' as synonymous"); *United States v. Jones*, No. 14-cr-148 (DWF/LIB), 2015 WL 927357, at *4 (D. Minn. Mar. 4, 2015) (evidence offered to establish a routine practice must support "'an inference of systematic conduct'"); 23 Charles Alan Wright & Arthur Miller, *Fed. Prac. & Proc. Evid.* § 5274 (2d ed.) ("'Routine practice' is conduct that an organization performs frequently and consistently in a specific situation.").

Although Rugged Races had a general policy of including information about injury trends in post-race reports, it was up to the project manager to decide at what point a multitude of injuries constituted a "trend."  Rugged Races did not provide any direction to the project manager—and, indeed, Rugged Races could not even describe how the particular project manager who supervised the 2016 race decided when a

"trend" had emerged.[9]  *See* Scudder Dep. II 58:12–60:9 (stating Rugged Races was

unsure if the project manager looked at injury reports in determining trends for the

post-race recap report).  In other words, there was nothing "routine" about decisions

that a project manager made regarding what injury-related information to include in

post-race reports.  Instead, it was a discretionary, idiosyncratic decision.  *Id.* at 58:12–25.

For these reasons, the evidence does not support Anderson's contention that,

during the 2016 race (and during other races staged in 2016), Rugged Races failed to

follow a routine practice of including information about injury trends in post-race

reports.

### c. Failure to Follow Construction Procedures

As described above, Rugged Races had a routine practice for constructing the

Bang the Gong obstacle, which involved marking and digging the landing pit, removing

debris from the pit, laying down tarp, performing two walkthroughs of the tarp-

covered pit, and filling the pit with water.  Melnik Dep. at 10:15–17, 14:9–13, 16:22–24,

17:16–24, 24:15–16, 26:5–9, 30:2–12.  Anderson argues, however, that there is evidence

that Rugged Races did not follow this practice when constructing Bang the Gong for the

---

[9]Brendan Maguire, who was the project manager for the 2016 race, died shortly
after this action was filed.  *See* Scudder Dep. I 20:3–10.  Rugged Races talked with
Maguire about the 2016 race after this action was filed, but they did not discuss why he
did not mention the injuries that occurred in connection with Bang the Gong in his post-
race report.  *Id.* at 20:14–21.

2016 race.  Anderson points to a statement in the post-race report about the 2016 race that describes the ground at Wild Mountain as "extremely soft."[10]  Solheim Decl. Ex. 2, Rugged Maniac Twin Cities Event Recap Rep.  Because of the soft soil, the report advises that "all the pits need water right away to retain the walls."  *Id.*  Anderson argues that if the pits needed to be filled with water "right away," then Rugged Races could not have inspected Bang the Gong's landing pit three times before filling the pit with water, as was Rugged Races' routine practice.

When asked about this portion of the report, Melnik testified that the process for constructing the Bang the Gong landing pit was the same in sandy soil as in other types of soil.  Melnik Dep. 75:3–12.  Further, Melnik could not remember any issues with construction of the 2016 race course and could not recall any deviation from the construction protocols.  *Id.* at 26:25–27:5, 29:1–19, 31:16–20.  Scudder reiterated that any problems constructing the 2016 race course would have been included in the report and that, based on his conversation with the project manager, the sandy soil was "handled without issue."  Scudder Dep. I 95:16–96:19.

---

[10]The soil at Wild Mountain was described elsewhere in the record as "sandy." *See* Scudder Dep. I 93:23–94:10.

*d.  Summary and Analysis*

In sum, the evidence in the record would permit a jury to find that Rugged Races failed to follow one of its routine practices in connection with the 2016 race—the routine practice of inspecting an obstacle after learning that a participant may have been injured because of a defect with the obstacle.  But this failure occurred *after* Anderson was injured, and thus obviously did not contribute to her injury.  *See Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995) ("There must also be a showing that the defendant's 'conduct was a substantial factor in bringing about the injury.'" (citation omitted)).  The same can be said about the project manager's failure to include information about the injuries suffered on Bang the Gong in his post-race report; the failure to *report* on Anderson's injury obviously did not *cause* her injury.

Anderson seems to recognize this, and thus relies on the following chain of inferences:  (1) Rugged Races failed to follow two of its routine practices at the 2016 race (the routine practice of promptly inspecting obstacles following injuries and the alleged routine practice of including information about injury trends in post-race reports); (2) that failure is evidence that Rugged Races may have failed to follow other routine practices, such as the routine practice of inspecting Bang the Gong's landing pit three times before filling it with water; and (3) had Rugged Races inspected Bang the Gong's

-26-

landing pit three times before filling it with water, it would have discovered and

removed the rock that caused Anderson's injury.

This a long and tenuous series of inferences.  Rugged Races maintained

numerous routine practices that were carried out by different people, at different times,

and in different situations.  *See* Wright & Miller, *Fed. Prac. & Proc. Evid.* § 5274 (noting

efficiency motivates the creation of routine practices to address frequently-occurring

matters).  The fact that *during the race* the *project manager* failed to inspect Bang the Gong

promptly after learning of the injuries suffered by Anderson and two others provides

little evidence that, a day or two *before* the race, a four-to-five member *construction crew*

failed to inspect Bang the Gong's landing pit before filling it with water.  *See* Scudder

Dep. II 44:16–20, 60:2–6 (describing the project manager's responsibility to inspect

injury-causing obstacles during the race); Melnik Dep. 27:19–22 (describing the

construction crew's responsibility to inspect obstacles during construction).  The one

has nothing to do with the other.

Likewise, the fact that *after the race* the *project manager* chose not to include

information about the injuries suffered by participants on Bang the Gong in his post-

race report provides no evidence that, a day or two *before* the race, the *construction crew*

failed to inspect Bang the Gong's landing pit before filling it with water.  Even if the

policy of including injury trends in post-race reports could be considered a "routine

practice"—and, as the Court has held, it cannot—the one routine practice is unrelated to the other.

Finally, as to the statement in the post-race report about the soft soil:  Even assuming that the landing pit of Bang the Gong was filled with water "right away" (notwithstanding the testimony to the contrary), the construction crew would have had to lay down the tarp and ensure that there were no hazards that could puncture or rip the tarp before they filled the pit with water.  *See* Melnik Dep. 14–17; Brust Decl. Ex. I, Photograph of Jeanne Anderson at Bang the Gong, ECF No. 62 (showing that the tarp was in place in the landing pit at the 2016 race).  In other words, *some* type of inspection must have occurred before the pit was filled with water, even if it was only one inspection (instead of three), and even if the inspection was somewhat rushed (because of concerns about the soft soil).  The fact that Rugged Races' routine practice was to inspect the landing pit three times before filling it with water does not mean that failing to inspect the landing pit three times is negligent.  Obviously, the routine practice of an organization can exceed what is necessary to avoid a finding of negligence.  Conducting a single quick inspection of a landing pit might have been negligent—the parties do not really discuss the issue, and the record contains no evidence directly addressing the question—but there is no evidence that it would have been *more* than negligent.

For Anderson's claim to succeed, she would have to introduce evidence not only that Rugged Races acted with greater-than-ordinary negligence in failing to more carefully inspect the pit, but that (1) the rock on which she landed was present in the pit before the pit was filled with water and (2) the rock would have been discovered if the construction crew and not acted with greater-than-ordinary negligence.  Anderson offers little more than speculation in support of these contentions.

### 4.  Low Water Level

Finally, Anderson argues that her injury could have been avoided if Bang the Gong's landing pit had been deeper, and Anderson cites expert testimony in support of her argument.  Pl.'s Mem. Opp'n Summ. J. 37; Ziejewski Decl. Ex. A, at Anderson00726–27 ("Water provides more resistance than air and a deeper pool could have ameliorated the hazardous condition at the bottom of this pool.  If deep enough, impact with the bottom could be avoided altogether; thus, easily preventing this type of occurrence by digging a deeper pool.").  What Anderson says may be true, but saying that a deeper pit could have prevented her injury is not the same as saying that Rugged Races acted with greater-than-ordinary negligence in designing the pit.

Nothing in the record suggests that Rugged Races was negligent in designing the water pit.  The design of Bang the Gong was based on the design of an older obstacle ("Leap of Faith"), which had been used successfully for years.  Scudder Dep. I

118:10–14, 121:5–13, 122:1–5.  In addition, Bang the Gong was tested prior to its

incorporation into the Rugged Maniac course to ensure that the water level in the

landing pit was sufficient.  *Id.* at 121:14–17; Scudder Dep. II 64:1–6.  And, of course, over

4,000 people participated in Rugged Maniac Twin Cities and jumped into Bang the

Gong's landing pit before or after Anderson, and yet only Anderson and four others

were injured.  The fact that thousands of participants—many of whom undoubtedly

outweighed Anderson—jumped into the landing pit without incident is compelling

evidence that the water level was not unreasonably low.[11]

*     *     *

In sum, no reasonable jury could find, based on the evidence in the record, that

Rugged Races acted with greater-than-ordinary negligence in connection with the 2016

race and that Rugged Races' greater-than-ordinary negligence caused Anderson to

---

[11]At the hearing, Anderson argued for the first time that Rugged Races was negligent in failing to *maintain* the water level in the landing pit throughout the race. *See* Mot. Hr'g Tr. 45:20–24, 46:2–14.  But "federal courts do not, as a rule, entertain arguments made by a party for the first time in a reply brief[,]" *Torspo Hockey Int'l, Inc. v. Kor Hockey Ltd.*, 491 F. Supp. 2d 871, 878 (D. Minn. 2007), much less arguments made by a party for the first time at oral argument, *see UnitedHealth Grp. Inc. v. Columbia Cas. Co.*, 47 F. Supp. 3d 863, 886–87 (D. Minn. 2014), *aff'd sub nom. UnitedHealth Grp. Inc. v. Exec. Risk Specialty Ins.*, 870 F.3d 856 (8th Cir. 2017).

injure her foot.  The Court therefore grants the summary-judgment motion of Rugged

Races and Wild Mountain[12] and dismisses this action with prejudice.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Defendants' motion for summary judgment [ECF No. 47] is GRANTED.

2.      Plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND

        ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  October 26, 2020                     s/Patrick J. Schiltz
                                            Patrick J. Schiltz
                                            United States District Judge

---

[12]The exculpatory clause in the Race Participant Agreement applies to Wild
Mountain, as well as Rugged Races.